**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CRIMINAL ACTION NO. 3:15CR-00143-CRS-DW-1**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**VS.**

**EARL CLAYTON, III**                                                               **DEFENDANT**

FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND RECOMMENDATION

Law enforcement officers stopped and searched Defendant Earl Clayton III's ("Clayton

III") vehicle near his son's home where a S.W.A.T team was preparing to execute a search

warrant. Clayton III has filed a motion to suppress all evidence obtained as a result of the search

of his vehicle and person and the custodial interrogation that followed. (DN 42; DN 43). The

United States has filed a response in opposition. (DN 44). On January 30, 2017, this Court held

an evidentiary hearing on the matter. (DN 62). Both the United States (DN 66; DN 74) and

Clayton III (DN 70) have filed post-hearing briefs. For the following reasons, the Court

recommends Clayton III's motion be **denied.**

FINDINGS OF FACT

A.  Background

Officers of the Louisville Metro Police Department arrested Clayton III on November 24,

2015. Detective Kevin McKinney ("Detective McKinney") executed the arrest and subsequently

completed an FD-302 form summarizing the events from that day. (DN  59, Def. Ex. 3). The

next day Detective McKinney filed a Criminal Complaint in this Court, alleging that Clayton III

and his son, Earl Clayton IV, aided and abetted each other to possess heroin with intent to distribute in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). (DN 1). Five days later, Clayton III appeared before the Court for his preliminary and detention hearing, and the United States called Detective McKinney to testify. (DN 25). Clayton III was subsequently indicted by a grand jury in the Western District of Kentucky. (DN 14).

In August of 2016, Clayton III filed the instant motions to suppress evidence. (DN 42; DN 43). This Court held a suppression hearing on January 30, 2017, and the United States called Detective McKinney, Detective Nathan Cary, and Detective Todd Jensen as witnesses.

B. Officer Testimony from the Suppression Hearing

At the suppression hearing, Detective McKinney testified to the following facts surrounding the arrest of Clayton III. (DN 60, at pp. 2-3).

The Louisville Metro Police Department conducted a controlled purchase of heroin from 5100 Roederer Drive, the residence of Earl Clayton IV ("Clayton IV"), as part of an ongoing investigation. (*Id.* at pp. 7, 11). Based largely on that purchase, officers obtained a state search warrant for the residence and for Clayton IV's person on November 23, 2015. (*Id.* at p. 4). Neither the search warrant nor affidavit for search warrant mentioned any individuals beyond Clayton IV to be searched. (DN 59, Def. Exs. 1, 2). The next morning, law enforcement prepared a S.W.A.T. team to execute the warrant based on its matrix standards and Clayton IV's violent history. (*Id.*; DN 59, Def. Ex. 1).

Before meeting the S.W.A.T. team at the Sixth Division, Detective McKinney performed a "spot check" on the residence. (*Id.* at p. 5). As he drove by 5100 Roederer Drive, he noticed a white Monte Carlo parked in the driveway and observed Earl Clayton III ("Clayton III") enter the back door of the home. (*Id.*). Another Detective, Todd Jensen, also testified that while

conducting drive-by surveillance on Roederer Drive before the search, he saw Clayton III in the driveway standing next to a white vehicle. (*Id.* at pp. 43-33). Detective McKinney knew that Clayton III was Clayton IV's father, that Clayton III had been identified in the current investigation "as a facilitator in the transaction of the heroin," and that Clayton III had prior history of drug dealing. (*Id.* at p. 8, 33). Detective McKinney drove back by the residence again, believing that Clayton III was still inside, and continued on to the Sixth Division. (*Id.* at pp. 5-6). Officers conducting surveillance observed Clayton III's vehicle remain at the Roederer Drive residence for approximately three minutes before leaving again. (DN 1, at p. 2; DN 25, at p. 4; DN 60, at p. 24).

About twenty to thirty minutes later, the S.W.A.T. team, along with Detective McKinney, drove to 5100 Roederer Drive and exited their vehicles a few houses down from the residence. (DN 60, at pp. 6, 11). At that point Detective McKinney noticed the same white Monte Carlo from his earlier "spot check" coming down Roederer Drive toward the target location. (*Id.* at p. 7). Detective McKinney believed that Clayton III was driving the car and that Clayton III was close enough to see the S.W.A.T. team preparing to enter his son's residence. (*Id.* at p. 6). Detective McKinney then observed the car stop in the middle of the street and then travel in reverse "at a high rate of speed" back towards Poplar Level Road. (*Id.*). He radioed to officers stationed on the ends of the street to stop the white Monte Carlo. (*Id.*). The justification for the stop, Detective McKinney testified, was based on the totality of the traffic violation (reversing at a high rate of speed), the search warrant being executed at the home, observation of Clayton III's presence and entry into the home shortly before the raid, and knowledge that Clayton III was a facilitator in heroin transactions in the ongoing investigation and had a prior history of drug dealing. (*Id.* at pp. 7-8, 11, 33).

Detective Nathan Cary ("Detective Cary") and Detective Jensen were two of the officers that performed the stop of Clayton III's vehicle. (*Id.* at pp. 40-43). Both Detectives testified at the suppression hearing and indicated they did not observe a traffic violation or have any independent justification for the stop beyond Detective McKinney's direction. (*Id.* at pp. 42, 47). Detective Jensen indicated he "mainly dealt with the female passenger" in the vehicle. (*Id.* at p. 43). He testified that when the female passenger put the window down, he noticed the smell of burnt marijuana and asked her to exit the vehicle. (*Id.*). Detective Cary removed Clayton III from the vehicle as well and sat him down on the curb. (*Id.* at p. 41). Based on the burnt marijuana odor, the Detectives searched the vehicle and located a handgun underneath the passenger seat. (*Id.* at p. 49).

Detective McKinney came to the scene while Clayton III and the female passenger were seated on the curb. (*Id.* at pp. 9, 42-43). Detective McKinney testified that, at that point, he read Clayton III his *Miranda* rights. (*Id.* at p. 9). Detective Cary corroborated during his testimony that Detective McKinney read Clayton III his *Miranda* rights when he was seated at the curb. (*Id.* at p. 42).

Detectives then took Clayton III to 5100 Roederer Drive. (*Id.*). After locating heroin on the kitchen counter and in a bedroom dresser at Clayton IV's residence, the Detectives interviewed Clayton III. (*Id.* at p. 10). Detective McKinney testified that he was unsure if he advised Clayton III of his *Miranda* rights again at the residence and stated that about 20 minutes elapsed between the admonition of rights at the traffic stop and the interview at 5100 Roederer Drive. (*Id.* at pp. 12-13). During the interview, Clayton III did not demonstrate reluctance to answer questions and did not ask to speak to a lawyer. (*Id.* at p. 13). Despite failing to record or get written admonition of Clayton III's waiver of rights, Detective McKinney testified that based

upon his interaction with Clayton III, he believed Clayton III understood his rights and waived them. (*Id.* at p. 14).

### C. Disputed Facts

Clayton III disputes Detective McKinney's rendition of facts from the suppression hearing by referencing Detective McKinney's affidavit for search warrant on 5100 Roederer Drive, Detective McKinney's FD-302-form[1] from the incident, and Detective McKinney's testimony at Clayton III's preliminary and detention hearing.

First, Clayton III asserts that Detective McKinney's testimony at the suppression hearing that he observed Clayton III's white Monte Carlo and observed Clayton III enter 5100 Roederer Drive as he drove past the house prior to the raid is not credible. (DN 70, at p. 17). Although reports and testimony establish that pre-raid surveillance had been conducted on 5100 Roederer the day the search warrant was executed, Clayton III points out that Detective McKinney never indicated he participated in that surveillance until the suppression hearing. (*Id.* at pp. 17-18). Clayton III highlights that Detective McKinney's FD-302 of the incident does not mention his observation of the white Monte Carlo prior to the raid and that Detective McKinney admitted at the suppression hearing that he did not participate in the pre-raid surveillance. (*Id.* at p. 18).

Second, Clayton III takes issue with Detective McKinney's testimony that he observed Clayton III commit a traffic violation and that such traffic violation was reason or part of the reason for the stop. (*Id.* at pp. 19-24). This testimony is not credible, according to Clayton III, because no mention was made by anyone, and no documentation exists, that he committed a traffic violation until Detective McKinney testified at the suppression hearing. (*Id.* at p. 19).

---

[1] An FD-302 form is a "summarization on an FBI form of the events that occurred on that date." (DN 60, at p. 16).

Clayton III notes that no "traffic violation" was mentioned in Detective McKinney's FD-302, criminal complaint, or preliminary and detention hearing testimony. (*Id.*).

Clayton III also briefly challenges that Detective McKinney never mentioned in prior testimony that the stop was motivated by "his knowledge of defendant's criminal history" until the suppression hearing. (*Id.* at p. 23). Because Defense counsel specifically asked Detective McKinney about the "only reason that the vehicle was stopped" and asked if there was "any other reason for stopping the vehicle[,]" and Detective McKinney did not mention Clayton III's criminal history or a traffic violation, Clayton III believes these are "fictitious reasons" to justify the traffic stop. (*Id.* at pp. 23-24).

To summarize, Clayton III believes that the Detectives concocted "alternative facts" to justify their actions after realizing they did not have a legally sufficient basis for his stop, arrest, and search. (*Id.* at p. 3). Clayton III maintains that the only credible facts known to Detective McKinney at the time of the stop were: (1) Clayton III stood next to his vehicle in the driveway of 5100 Roederer Drive for a period of three minutes well before the execution of the warrant and (2) Clayton III came back to the area in his car while the search warrant was being executed, stopped approaching the house when he saw the SWAT team, reversed his car, and left the area. (DN 70, at p. 27). These two credible facts, Clayton argues, were the sole basis for Detective McKinney's ordered stop.

### D. Credibility Determinations

At the outset, the Court generally disagrees with Clayton III's allegations that Detective McKinney's testimony is inconsistent. Though his FD-302, criminal complaint, and testimony from the preliminary and detention hearing were not all-encompassing, Detective McKinney's recollections were not contradictory.

In the criminal complaint, Detective McKinney stated that during surveillance prior to executing the search warrant, officers observed "a white Chevrolet Monte Carlo pull into the driveway[,]" Clayton III exited the vehicle and entered the home, and Clayton III remained in the home for approximately three minutes before leaving again in the Monte Carlo. (DN 1). These facts never changed. Detective McKinney testified as to the same pre-search surveillance and same observations involving Clayton III and the Monte Carlo at both the preliminary/detention hearing (DN 25, at p. 4, 6) and at the suppression hearing. (DN 60, at pp. 5-7). The fact that this information was not recorded in Detective McKinney's FD-302 does not make the testimony inconsistent.

Likewise, Detective McKinney's statement from his FD-302 form that he observed a white Chevrolet Monte Carlo backing down the street at a high rate of speed as the S.W.A.T. team was about to enter 5100 Roederer Drive (DN 60, Def. Ex. 3) never changed. Detective McKinney offered the same testimony at the preliminary/detention hearing (DN 25, at p. 6) and at the suppression hearing (DN 60, at p. 6). Although the Complaint did not mention the "high rate of speed" at which Clayton III reversed, it does state that the white Monte Carlo "immediately stopped and reversed direction when within view of the residence." Again, these statements are consistent and do not call Detective McKinney's credibility into question.

Neither is Clayton III's challenge to Detective McKinney's consideration of his prior criminal history persuasive. Clayton III is correct that Detective McKinney did not mention that consideration during the preliminary/detention hearing or in any documentation beforehand. But that does not render Detective McKinney's statement that he considered Clayton III's prior criminal history inconsistent. To be sure, Detective McKinney's earlier Complaint indicated that officers recognized Clayton III as involved in heroin trafficking and knew that Clayton III was a

convicted felon that was on federal supervised release on the day of the search. (DN 1, at pp. 1-2). Because Clayton III does not produce evidence casting doubt on Detective McKinney's and the other officer's familiarly with the Defendant, the Court finds this testimony is credible.

The only potentially contradictory testimony Detective McKinney offered at the suppression hearing was his statement that Clayton III committed a traffic violation by stopping in the middle of the road and backing up at a high rate of speed. (DN 60, at p. 8). During the preliminary/detention hearing, Detective McKinney testified that he didn't know if a traffic violation occurred, but the reason that he wanted the vehicle stopped was because Clayton III "had within a short period of time been to the home for three minutes, left the home, and then reversed his course when he came back and observed officers entering the house." (DN 25, at pp. 6-7). However, the fact that Clayton III stopped his vehicle upon seeing the police activity and then traveled in reverse a considerable distance on a residential street is not in dispute. It is that fact, and not whether Detective McKinney thought it was a traffic violation at the time of his previous testimony, that the Court considers relevant to the reasonable suspicion analysis.

Beyond this "traffic violation" testimony, the Court finds Detective McKinney's recollections from his FD-302 form, the criminal complaint, his testimony at the preliminary/detention hearing, and his testimony at the suppression hearing are consistent and credible. After hearing the testimony of all of the witnesses and having had the opportunity to observe said witnesses on the stand and assess their demeanor, the Court credits Detective McKinney's testimony as a whole, along with the other Detectives' testimony. The Court therefore finds credible Detective McKinney's knowledge from the ongoing heroin investigation that Clayton III was involved in drug transactions, Clayton III's history of prior drug dealing, observing Clayton III enter the residence prior to the search for a short stay, observing the same

vehicle and person return to the residence a short time later, and observing the vehicle reversing at a high rate of speed away from the residence.

CONCLUSIONS OF LAW

Clayton III raises two primary issues for the Court to consider. The first is whether Detectives had reasonable suspicion to stop his vehicle under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). (DN 70, at pp. 27-28). Specifically, Clayton III believes the Detectives have not identified specific and articulable facts that at the time of the stop he was engaged in or about to engage in criminal activity. (*Id.* at p. 28). Because the traffic stop was illegal, Clayton III alleges the firearm discovered in his vehicle and the statements from the interrogation must also be suppressed. (*Id.* at p. 31). The second issue is whether the Detectives' lack of proper *Miranda* warnings constitutes an independent ground for suppressing Clayton III's statements from the interrogation. (*Id.* at p. 32).

A. Detectives' Stop of Clayton III's Vehicle

The Fourth Amendment of the United States Constitution protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. Under *Terry v. Ohio*, however, police officers may make an investigative stop of a vehicle "when they have reasonable suspicion of an ongoing crime." *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) (quoting *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007)). The level of suspicion necessary for a *Terry* stop is relatively minimal and "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L.Ed.2d 1 (1989). *Terry* stops, instead, must only be supported by specific and articulable facts that would "warrant a man of reasonable caution in the belief that the action taken was

appropriate." *Terry*, 392 U.S. at 21-22. No "bright-line rule" exists for determining whether an officer has reasonable suspicion. *United States v. Ellis*, 497 F.3d 606, 612 (6th Cir. 2007) (citation omitted). In lieu, the Court considers the "totality of the circumstances" surrounding the stop in determining whether a *Terry* stop is valid. *Blair*, 524 F.3d at 750.

The United States argues that several factors established reasonable suspicion that Clayton III was engaging in criminal activity: (1) Clayton III's history of prior drug dealing; (2) the fact that he had facilitated previous controlled purchases of heroin from Clayton IV at the house being searched; (3) his entry into 5100 Roederer Drive for three minutes before the search; and (4) his suspicious behavior in backing down the street at a high rate of speed when he saw the officers entering the house. (DN 66, at p. 2).

After reviewing the circumstances surrounding the Detectives' stop of Clayton III, the Court finds the Detectives had reasonable suspicion to stop Clayton III for drug activity. First, Detective McKinney's observations of Clayton III at 5100 Roederer Drive prior to executing the search warrant are a relevant consideration in the reasonable suspicion analysis for a number of reasons. While "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime[,]" officers are not required to ignore the relevant characteristics of a location when assessing reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L.Ed.2d 570 (2000). In the present case, the 5100 Roederer Drive residence was a known location of drug transactions from the Louisville Metro Police's ongoing heroin trafficking investigation. Indeed, a controlled purchase of heroin had been made at the residence from Clayton IV within 48 hours of the search warrant being signed.

Not only was Clayton III present at a known drug trafficking location, but his behavior at the residence shortly before the search was indicative of drug trafficking as well. Detective McKinney observed Clayton enter the home, remain at the location for approximately three minutes, and leave the home again. This "short stay," Detective McKinney testified, "was indicative of a narcotics transaction." (DN 25, at p. 6).

Detective McKinney's observation of Clayton III returning to Roederer Drive as the S.W.A.T. team executed the search warrant gives additional support for reasonable suspicion. He consistently testified that as the S.W.A.T. team prepared to enter 5100 Roederer Drive he observed Clayton III drive his white Monte Carlo down the street, stop the car abruptly in the middle of the road, and reverse at a high rate of speed. The rate of speed at which Clayton III reversed his vehicle was "suspect" and "caused alarm" to Detective McKinney. (DN 60, at p. 34). The Supreme Court has acknowledged that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L.Ed.2d 570 (2000)). For instance, "obvious attempts to evade officers can support a reasonable suspicion." *United States v. Brigoni-Ponce*, 422 U.S. 873, 885, 95 S. Ct. 2574, 45 L.Ed.2d 607 (1975). "The abruptness . . . of a suspect's departure upon noticing the police" is a factor that may contribute to an officer's reasonable suspicion. *United States v. Johnson*, 620 F.3d 685, 694 (6th Cir. 2010).

Defense Counsel attempts to downplay Clayton III's abrupt departure from the search scene by arguing that it was a natural reaction for a law abiding citizen to reverse and leave the area after observing a S.W.A.T. team breaking into a home, flash bangs going off, and armed individuals guarding the perimeter. (DN 70, at p. 30, n.10). Defense Counsel emphasizes that when he asked Detective McKinney how he would react to such a situation, Detective McKinney

11

testified that he would not keep driving toward a S.W.A.T. team in the course of breaking into a home. Clayton III's actions, according to Defense Counsel, are "exactly what Detective McKinney wanted and intended for him – or anyone else on the property to do and what Detective McKinney himself or any reasonable person would have done under similar circumstances." (DN 70, at p. 31).

Clayton III's abrupt departure from the scene, however, cannot simply be treated as that of "any reasonable person" because of his suspicious behavior observed by officers prior to the search. Detectives observed Clayton III at the drug trafficking location prior to the search, watched him enter the home for a short period of time, and saw him return to the location within about thirty minutes. This behavior reasonably raised the suspicions of Detectives, making Clayton III's abrupt departure from the scene upon viewing law enforcement more suspect.

Against this backdrop of suspicious drug-trafficking behavior before and during the S.W.A.T. team's search was Detective McKinney's knowledge of Clayton III's criminal history and involvement as a facilitator in the heroin purchases in their ongoing investigation. An officer's awareness of an individual's past criminal history "by itself, does not create a reasonable suspicion that criminal activity is *currently* afoot," which is what the Supreme Court requires. *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (citing *Terry*, 392 U.S. at 30); *see also Allen v. Thompson*, 14 F. Supp. 3d 885, 895 (W.D. Ky. 2014). Still, "past criminal history is a factor that can be taken into consideration" when the officers who conduct the stop knew about the suspect's criminal record beforehand. *Id.*; *see United States v. Robinson*, 1998 WL 322656, 149 F.3d 1185, at *5 (6th Cir. May 22, 1998) (table). Detective McKinney testified that when he saw Clayton III in the driveway at 5100 Roederer, he knew that he had been involved in other drug cases and had knowledge of Clayton III's prior drug dealing. (DN 60, at p. 33). The specific

12

nature of Clayton III's criminal history – involvement with drug dealing – casts a suspicious light on otherwise seemingly innocent behavior, especially when combined with Detective McKinney's observations of Clayton III before and during the S.W.A.T. team's search of 5100 Roederer Drive. *See United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012) (Defendants' criminal histories, including involvement with narcotics, when combined with their dubious travel plans, cast suspicious light on otherwise weaker indicators); *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010) (knowledge of specific history in drug trafficking weighed in favor of reasonable suspicion).

Based on the Officers' knowledge of Clayton III as a facilitator in the drug investigation and knowledge of Clayton III's prior drug dealing and involvement in drug cases, Officers' observance of Clayton III's presence and entry into 5100 Roederer for a short stay before the search, and Clayton III's returning to the scene and reversing his vehicle at a high rate of speed upon seeing law enforcement, the Court finds the totality of the circumstances collectively give rise to reasonable suspicion that criminal activity was underfoot. The Detectives' stop of Clayton III's white Monte Carlo was, therefore, valid under *Terry*.[2]

Clayton III also indicates that Detective Cary improperly stopped and detained him based solely on Detective McKinney's directive. (DN 70, at p. 29). Although Detective McKinney did not actually perform the stop of Clayton III's vehicle, his reasonable suspicion was imputed to Detectives Cary and Jensen under the collective knowledge rule. This well-established rule

---

[2] Although Detective McKinney did give somewhat conflicting testimony as to whether a traffic violation occurred, the traffic violation is of no import because Detective McKinney had reasonable suspicion to perform an investigative stop the vehicle under *Terry*. The United States Supreme Court has repeatedly emphasized that an officer's subjective motivation for making a stop is irrelevant, "as long as the circumstances viewed objectively, justify [the] action." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404, 126 S. Ct. 1943, 164 L.Ed.2d 650 (2006) (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978)).

permits an officer to conduct a stop based on information obtained by fellow officers. *United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012) (citing *United Statesv. Barnes*, 910 F.2d 1342, 1344 (6th Cir. 1990), *United States v. Hensley*, 469 U.S. 221, 231, 105 S. Ct. 675, 83 L.Ed.2d 604 (1985)). This rule recognizes the practical reality that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *Id.* at 766 (quoting *Hensley*, 469 U.S. at 231).

In *Lyons*, the Sixth Circuit found that even though troopers who performed the stop did so solely on the basis of a different agent's request, with no independent basis for targeting the vehicle, the collective knowledge doctrine applied because "[t]he troopers possessed all the information they needed to act—a request by the DEA (subsequently found to be well-supported) that they execute the traffic stop in the expectation that illegal narcotics would be found in the vehicle." 687 F.3d at 768-69. Here, the Detectives who responded to Detective McKinney's request to stop the Monte Carlo possessed all of the information they needed to act. Both Detectives Cary and Jensen were conducting surveillance near the Roederer Drive residence in support of the search warrant execution when Detective McKinney requested the stop. (DN 60, at pp. 40-41, 43). Because Detectives Cary and Jensen were aware of the S.W.A.T. team's search and were conducting surveillance related to such search and investigation, the Court finds they were entitled to rely on Detective McKinney's representations, albeit brief, about stopping the vehicle. The Detectives clearly acted on Detective McKinney's directive and executed the stop within the bounds of his reasonable suspicion. Accordingly, the collective knowledge doctrine applies and the traffic stop was valid. The Court recommends denial of Clayton III's request for suppression of evidence on these grounds.

B. Detectives' Interrogation of Clayton III

Clayton III also argues that Detective McKinney's lack of proper *Miranda* warnings constitutes an independent ground to suppress his statements from the interrogation. (DN 70, at p. 32). He asserts that the United States has failed to demonstrate that proper warnings were given, understood, and waived because the "so-called reading of rights was not recorded or memorialized in any way" and his alleged waiver was not recorded. (*Id.*).

Because custodial interrogations are coercive by nature, *Miranda* warnings are necessary to protect a defendant's Fifth and Sixth Amendment rights. *United States v. Spaulding*, 446 F. Supp. 2d 789, 799 (N.D. Ohio 2006). It is the government's burden to establish by a preponderance of the evidence that the defendant, once taken into custody, was provided the required *Miranda* warnings and the defendant knowingly and voluntarily waived his rights to silence and to counsel prior to speaking with the police. *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)).

In order to be "voluntary," the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000) (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L.Ed.2d 410 (1986) (additional citation omitted)). The waiver must also be made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Adams*, 583 F.3d at 467. The relevant question for the Court is not whether the criminal suspect knew and understood every possible consequence of a waiver, "but rather whether the suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Colorado v. Spring*, 479 U.S. 564, 574, 107 S. Ct. 851, 93 L.Ed.2d 954

(1987)). The Court must examine "the totality of the circumstances" in evaluating whether the defendant has made a knowing, intelligent, and voluntary waiver. *See Murphy v. Ohio*, 551 F.3d 485, 511 (6th Cir. 2009), *cert. denied*, 558 U.S. 949 (Oct. 13, 2009).

The Sixth Circuit has held that a *Miranda* "waiver may be clearly inferred . . . when a defendant after being properly informed of his rights and indicating that he understands them, nevertheless, does nothing to invoke those rights" and speaks. *Nichols*, 512 F.3d at 798-99. A waiver of *Miranda* rights, thus, need not be made in writing and need not be expressly made. *Adams*, 583 F.3d at 467 (citing *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002)).

First, *Miranda* and its progeny do not direct that the administration of *Miranda* warnings must be recorded or memorialized. Detective McKinney offers testimony, corroborated by Detective Cary, that he verbally informed Clayton III of his *Miranda* rights when he approached Clayton III and found him sitting on the curb.[3] (DN 60, at pp. 9, 42). Detective McKinney further explained that he did not record his admonition of *Miranda* rights because when he went to the traffic stop he did not have his recorder – it was in another officer's vehicle. (*Id.* at p. 12). Because Clayton III offers no evidence that rebuts Detective McKinney's repeated testimony that he gave Clayton III *Miranda* warnings while seated at the curb, the Court finds he was properly advised of his rights.

Second, although Detective McKinney did not have Clayton III execute a formal written waiver of his *Miranda* rights, this fact is not determinative, as the record reflects by a

---

[3] Clayton III again challenges Detective McKinney's testimony as not credible regarding the administration of Miranda warnings. Detective McKinney's earlier testimony from Clayton III's preliminary/detention hearing, however, indicated that he read Clayton III his *Miranda* rights, that it was consistent with protocol to not record these rights, and that other officers were present when he administered the rights and obtained the waiver. (DN 25, at p. 9). Detective McKinney's Complaint likewise mentioned the *Miranda* warnings. (DN 1, at p. 2 (stating "during post-Miranda interviews")).

preponderance of the evidence that Clayton III knowingly and voluntarily waived his *Miranda* rights. *See United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009). Detective McKinney testified that Clayton III was cooperative, understood what he was talking about, and answered questions. (DN 60, at p. 13). Of note, Detective McKinney testified that Clayton III neither indicated reluctance to answer questions nor stated he wanted to talk to a lawyer. (*Id.*). The record gives no indication that any coercion or deceptive tactics were used to obtain Clayton III's waiver or that Clayton III requested the interrogation cease at any time. Clayton III again fails to rebut Detective McKinney's testimony and makes no argument whatsoever that his waiver was involuntary or unknowing. Under the totality of the circumstances, it appears to the Court that Clayton III made a knowing and voluntary waiver of *Miranda* rights after being advised of them by Detective McKinney before the interrogation. For these reasons, the Court recommends Clayton III's request for suppression of statements should be **denied.**

<u>RECOMMENDATION</u>

For the foregoing reasons, the Court **recommends** Clayton III's Motions to Suppress (DN 42; DN 43) be **DENIED** as to all claims.

## <u>NOTICE</u>

Therefore, under the provisions of 28 U.S.C. Sections 636(b)(1)(B) and (C) and Fed.R.Crim.P. 59(b)(2), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. Fed.R.Civ.P. 59(b)(2). If a party has objections, such objections must be timely filed or further appeal is waived. *Thomas v. Arn*, 474 U.S. 140, 150-51, 106 S. Ct. 466, 88 L.Ed.2d 435 (1985).

Copies:        Counsel of Record